IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DUNG VAN NGUYEN,

    Plaintiff,                      No. CIV S-07-1372 EFB

    vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.                 <u>ORDER</u>
_____/

      Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). For the reasons discussed below, the court denies plaintiff's motion for summary judgment or remand, and grants the Commissioner's cross-motion for summary judgment.

I. <u>BACKGROUND</u>

      Plaintiff, born February 24, 1971, applied for supplemental security income on July 12, 2004. Administrative Record ("AR") 52-69, 53. Plaintiff stated that he last worked in December 2001, and that he became unable to work on April 1, 2004, due to "head injured, mental," causing "daily headaches, depression, forgetfulness," symptoms that began to bother him in 1997. AR 53, 78. Plaintiff worked as a butcher from 1992 to 1996, which required

1

standing six hours a day and frequently lifting fifty pounds. AR 79. At the time he filed his application, plaintiff was thirty-three years old, had never been married, had completed no formal schooling, and could not read or write English. AR 54, 84, 77. Plaintiff lives with two friends. AR 57.

At the July 13, 2005 hearing before administrative law judge ("ALJ") Daniel Heely, plaintiff testified, assisted by an interpreter and by counsel, that he was born in Vietnam and came to the United States in 1991. AR 227. Plaintiff testified that he is unable to perform his past work because, "I got sick and I cannot mix the people or talk to the people. . . . I got scared, nervous. . . . I just scared people hurt me." AR 228. Plaintiff stated he received mental health treatment "in prison"[1] and his medications "help little." *Id*. Plaintiff testified that during the day he will "[w]alk around on the street outside and stay in the house, sit in the house," but does not visit with anybody, go shopping or go to church. AR 228-229.

The ALJ issued a decision on September 17, 2005, finding that plaintiff is not disabled.[2]

---

[1] Plaintiff apparently references being booked following a fight with a girlfriend. AR 204, 166-167.

[2] Disability Insurance Benefits ("DIB") are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 *et seq*. Supplemental Security Income ("SSI") is paid to disabled persons with low income. 42 U.S.C. §§ 1382 *et seq.* Under both provisions, disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits. *See* 20 C.F.R. §§ 423(d)(1)(a), 416.920 & 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

Step four: Is the claimant capable of performing his past work? If so, the claimant is not

AR 11-23. The ALJ made the following findings (AR 22):

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant's post traumatic stress disorder is a "severe" impairment, based upon the requirements in the Regulations (20 C.F.R. 416.920).

3. The medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

5. The claimant has the following residual functional capacity: does not speak English, occasional public contact.

6. The claimant is unable to perform any of his past relevant work (20 C.F.R. 416.965).

7. The claimant is a "younger individual between the ages of 18 and 44" (20 C.F.R. 416.963).

8. The claimant is "unable to communicate in English" (20 C.F.R. 416.964).

9. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 C.F.R. 416.968).

10. The claimant has the residual functional capacity to perform substantially all of the full range of heavy work (20 C.F.R. 416.967).

11. Based on an exertional capacity for heavy work, and the claimant's age, education, and work experience, Medical-Vocational Rule 204, Appendix 2, Subpart P, Regulation No. 4 would direct a conclusion of "not disabled."

12. The claimant's capacity for heavy work is substantially intact and has not been significantly eroded by any nonexertional limitations. Accordingly, using the above-cited rule(s) as a framework for decision-making, the claimant is not disabled.

---

disabled. If not, proceed to step five.

Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater,* 81 F.3d 821, 828, n. 5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Bowen*, 482 U.S. at 146, n. 5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. *Id.*

13. The claimant was not under a "disability," as defined in the Social Security Act, since any time through the date of this decision (20 C.F.R. 416.920(g)).

On June 13, 2007, the Appeals Council denied plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. AR 4-8.

## II. ISSUES PRESENTED

Plaintiff contends that the Commissioner erred in concluding that plaintiff can perform the mental demands of unskilled work, (1) due to improperly discounting plaintiff's language and literacy limitations, (2) improperly rejecting the opinion of examining consultative psychiatrist, Les P. Kalman, M.D., and relying on the opinion of examining consultative psychologist, James Wakefield, Ph.D., and (3) improperly discrediting the third party evidence offered by plaintiff's friend, Hien Nguyen.

## III. LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.,* 223 F.3d 968, 973 (9th Cir.2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir.1999); *Tackett v. Apfel,* 180 F.3d 1094, 1097 (9th Cir.1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. See *Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir.1985). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Saelee v. Chater,* 94 F.3d 520, 521 (9th Cir.1996). " 'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401(1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir.2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation,

4

one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart,* 278 F.3d 947, 954 (9th Cir.2002).

## IV. MEDICAL EVIDENCE

### A. TREATMENT HISTORY

Plaintiff's treatment records begin March 2003, at San Joaquin County General Hospital, when plaintiff initially sought care for a headache. He was prescribed Naprosyn and directed to become an established patient. AR 176. Plaintiff returned in May, June and October 2003, and March 2004, for medication refills, and reported that his headaches had improved. AR 172-174.

In April 2004, plaintiff complained that his headaches had worsened over the past two weeks, that he was sleeping poorly, and had been wetting his bed for the past two months. AR 169-171. Plaintiff was prescribed Tylenol and Imipramine (an antidepressant[3] but expressly prescribed for plaintiff's enuresis). AR 170, 212. Later in April 2004, plaintiff reported improvement in both his headaches and enuresis. AR 168. Pursuant to a mental status examination, with the assistance of an interpreter, the attending physician noted plaintiff's report of head injury in Vietnam thirteen years before, but that plaintiff was in no acute distress and his "speech, mood and affect [were] congruent and appropriate." AR 168. The attending physician referred plaintiff to San Joaquin County Mental Health Services, noting plaintiff's reported history of depression, "hearing voices" and "feeling afraid." AR 168, 212.

Plaintiff was initially seen at San Joaquin County Mental Health Services in June 2004.[4] Plaintiff reported that he had no medical illnesses. AR 197, 201. A mental status examination revealed that plaintiff was alert with a "fair range" of affect; he recounted being hit on the head by communists because he is half Causcasian, half Asian; he reported that he has nightmares of

---

[3] All prescriptive descriptions are taken from the Physicians' Desk Reference ("PDR"), 63rd ed. (2009).

[4] Plaintiff misstates that he was seen at San Joaquin County Mental Health Services in January and February 2004. Pl.'s Mem., at p. 3. The correct dates are 2005. AR 208, 209.

5

shooting and killing; that he feels distant from, and afraid to be with, other people; that his sleeping, concentration and appetite are "up and down;" he denied auditory hallucinations but stated that he saw "ghosts," and was afraid of being followed by someone who is jealous of him; plaintiff stated that he likes to garden. AR 197. The attending psychiatrist made the following diagnosis pursuant to the American Psychiatric Association's multiaxial framework (AR 197-198, 201):[5]

| | | |
|---|---|---|
| Axis I: | | Post-traumatic Stress Disorder |
| | | Depressive Disorder NOS [not otherwise specified] |
| Axis II: | | Deferred |
| Axis III: | | None |
| Axis IV: | | Exposure to war. Acculturation difficulties. Occupational, e.g., unemployment. Economic, e.g., no income, living off savings, has a manicure license. Ins[urance], e.g., none. Housing, e.g., living with a friend. |
| Axis V: | | GAF 40-45[6] |

Plaintiff was placed on a trial of Lexapro, generally prescribed to treat depression and anxiety disorder. AR 198. In July 2004, plaintiff reported improvements in his mood and sleep, with decreased nightmares. *Id.*

In February 2005, plaintiff reported continuing symptoms of depression and post-traumatic stress disorder; his physicians discontinued plaintiff's prescription for Lexapro, and

---

[5] The American Psychiatric Association's Multiaxial Assessment is set forth in the Diagnostic and Statistical Manual of Psychiatric Disorders, ("DSM-IV") (4th Ed. 2005), at pp. 27-37:

| | |
|---|---|
| Axis I: | Clinical Disorders |
| | Other Conditions That May Be a Focus of Clinical Attention |
| Axis II: | Personality Disorders |
| | Mental Retardation |
| Axis III: | Medical Conditions |
| Axis IV: | Psychosocial and Environmental Problems |
| Axis V: | Global Assessment of Functioning ("GAF"). |

The GAF Scale "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Id.* at 34.

[6] A GAF of 41 to 50 denotes "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifiting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV, at p. 34.

6

prescribed the antidepressant/anti-anxiety medications Zoloft and Seroquel. AR 210, 208. Plaintiff reported improvements in his symptoms in March and May 2005, e.g., that the voices he hears saying "they hate him doesn't particularly bother him." AR 207- 208. Plaintiff declined individual or group therapy, and was given a flyer describing the Stockton Adult School's ESL and vocational preparation classes. AR 207.

### B. CONSULTATIVE EXAMINATIONS

#### 1. Psychologist James A. Wakefield, Jr., Ph.D.

On September 1, 2004, at the request of the Commissioner, psychologist James A. Wakefield, Jr., Ph.D., interviewed plaintiff and administered two psychological tests, the Test of Nonverbal Intelligence, Third Edition ("TONI-3"), and the Bender Gestalt. AR 161-164. Dr. Wakefield noted that plaintiff drove himself to the appointment, arrived alone and on time. A Vietnamese interpreter assisted with the interview and testing. Plaintiff told Dr. Wakefield that he "was exposed to war and had nightmares about shooting and killing. He was hit on the head by the communists because he is half Caucasian and half Asian." AR 161, 162. Plaintiff stated that he "went to school to the first grade in Vietnam and then went to Adult School in this country;" that he worked as a butcher from 1992 to 1996, and "worked for seven or eight different companies;" that his "last job was cutting beef" and he "left that job in 1997 but did not know why he left." Plaintiff also stated that he had a manicure license. *Id.* Plaintiff stated that he "lives with a friend," and during the day plaintiff "sits outside." Dr. Wakefield observed that plaintiff appeared "fluent" in his "extended utterances with the interpreter," but his "effort was clearly reduced during testing, and the results underestimate his ability." AR 162. Dr. Wakefield opined that the results of the TONI-3 indicated malingering,[7] while plaintiff's

---

[7] Dr. Wakefield opined: "On the TONI-3, Dung's measured nonverbal intellectual functioning was deficient (IQ=64, 1st percentile) on Form A. His performance on this test was at the level expected of a child aged five years nine months. The items on Form B were then administered in reversed order of difficulty. Dung responded to the more difficult items correctly and missed the easier ones. This pattern strongly suggests malingering." AR 163.

7

performance on the Bender-Gestalt appeared inconsistent with his ability to drive a car.[8] AR 163. Dr. Wakefield concluded that plaintiff's intellectual ability could not be adequately assessed due to malingering, and made the following diagnoses pursuant to the American Psychiatric Association's multiaxial framework (AR 163):[9]

        Axis I:        Malingering (V65.2)
                            Post-traumatic Stress Disorder (309.81)
        Axis II:       deferred due to malingering
        Axis III:      head injury (by report)
        Axis IV:      Psychosocial and Environmental Problems:
                            lives with friend, unemployed
        Axis V:       GAF = unknown due to malingering

Dr. Wakefield reached the following conclusions (AR 164):

> [Plaintiff] is able to handle his own funds. His appearance is adequate. Dung can follow simple work rules, although his ability to perform more complex procedures could not be assessed due to malingering. Dung appears to be able to interact with co-workers, supervisors, and the public in Vietnamese. He is able to sit, stand, walk, move about, handle objects, hear, speak, and travel adequately. Dung's ability to reason and make occupational, personal, and social decisions in his best interests is presented as deficient. His social and behavioral functioning are calm and appropriate (except for malingering). Dung's concentration, persistence, and pace are presented as deficient, although stronger abilities in this

---

[8] Dr. Wakefield found: "The Bender-Gestalt, a test of perceptual-motor development, was administered. On this test, Dung's copies of a series of geometric figures were very deficient for an adult. His figures included numerous errors of distortion, rotation, and integration of parts of figures. His pencil strokes were firm and well-controlled, and the figures precisely closed. He declined to attempt one of the more difficult figures. Dung's performance on this test was very poor but does not appear to indicate organic involvement. His performance on this test also does not appear consistent with his ability to drive a car." AR 163.

[9] The American Psychiatric Association's Multiaxial Assessment is set forth in the DSM-IV at pp. 25-33:

        Axis I:        Clinical Disorders
                            Other Conditions That May Be a Focus of
                            Clinical Attention
        Axis II:       Personality Disorders
                            Mental Retardation
        Axis III:      Medical Conditions
        Axis IV:      Psychosocial and Environmental Problems
        Axis V:       Global Assessment of Functioning ("GAF").

The GAF Scale "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DSM-IV, at p. 32.

area are suspected.

### 2. Psychiatrist Les P. Kalman, M.D.

On July 13, 2005, at the request of plaintiff's counsel, psychiatrist Les P. Kalman, M.D., conducted a mental status examination of plaintiff. Dr. Kalman noted that plaintiff arrived on time, driven by a friend, and accompanied by an interpreter. Plaintiff stated that he was "anxious, scared of people," and recounted that people beat him while he was growing up in Vietnam because he had a GI American father; that he was taunted and picked on and beaten by other children in the village, and so only went to school for one year. Plaintiff stated that for the past year he had been hearing voices that are "'twisting him,' saying bad things to him like 'you're a white boy I'm going to kill you,'" and "sees things and reports them as shadows and figures that are next to him and trying to hold him down." AR 203. Plaintiff stated that he had attempted suicide in 1997, by overdosing on medications, when his mother kicked him out of their house; that he was anxious and depressed; that he suffered insomnia and anorexia. AR 203; *see also* AR 85, 158.

Plaintiff told Dr. Kalman that he worked on and off for five years at a slaughter house, but "that he felt ill and that he couldn't remember things and mainly he just couldn't be around people as he thought they were going to hurt him. He was very scared and frightened to go to work." AR 203.

Pursuant to a mental status examination, Dr. Kalman made the following diagnosis (AR 205):

```
Axis I:     Schizoaffective Disorder
Axis II:    Borderline Intellectual Functioning
Axis III:   None
Axis IV:    Illiterate
Axis V:     GAF of 55[10]
```

---

[10] A GAF of 51 to 60 denotes "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." DSM-IV, at p. 34.

Dr. Kalman found that plaintiff can "do his own shopping, cooking and housekeeping," "maintain his transportation," and "take care of his personal hygiene." *Id*. He found, with respect to social functioning, that plaintiff is estranged from his family and has no friends, and that with respect to plaintiff's daily activities, he stated that he "walk around and come home and then walk around again." Dr. Kalman noted that plaintiff lives with a friend. AR 204.

Dr. Kalman completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment, in which he assessed mild to moderate limitations in plaintiff's ability to understand and remember; mild to marked limitations in plaintiff's ability to sustain concentration and persistence; mild to moderate limitations in plaintiff's ability to interact socially; and mild to moderate limitations in plaintiff's ability to adapt. Dr. Kalman opined that plaintiff would miss work three to four times per month due to his impairments. AR 214- 217.

## C. STATE AGENCY REVIEWS

On September 16, 2004, Social Security Administration medical consultant D.R. Walk, M.D., whose specialty is psychiatry, reviewed plaintiff's medical records and the report of Dr. Wakefield, and completed both a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique Form. AR 18, 177-194. Dr. Walk found that plaintiff has an anxiety-related disorder based on recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. AR 177, 186. Referencing the "B criteria" for assessing a claimant's mental residual functional capacity,[11] Dr. Walk found that plaintiff has "mild" restriction of activities of daily living; "moderate" difficulties in social functioning; "mild" to

---

[11] As set forth in 20 C.F.R. § 416.920a, a medically determinable mental impairment must be assessed in accordance with the following four functional areas (the "B criteria"): Activities of daily living; Social functioning; Concentration, persistence, or pace; and Episodes of decompensation. A five-point scale is used to rate the degree of limitation in the first three functional areas ("None, mild, moderate, marked, and extreme"). A four-point scale is used to rate the degree of limitation in the fourth functional area ("None, one or two, three, four or more).

"no" difficulties in maintaining concentration, persistence, or pace; and offered no opinion regarding extended episodes of decompensation. AR 191. The only specific limitations found by Dr. Walk involved social interaction, specifically, that plaintiff is "moderately limited" in his ability to interact appropriately with the general public, and to get along with peers or coworkers without distracting them or exhibiting behavioral extremes. AT 178. As summarized by Dr. Walk, plaintiff 's "anxiety may reduce social interactions." AR 179.

The findings of Dr. Walk were affirmed by Social Security Administration medical consultant Dr. E. Harrison, M.D, on January 5, 2005. AR 179, 181.

V. THIRD PARTY STATEMENT

Plaintiff's friend, Hien Nguyen, with whom plaintiff lives (AR 56, 57, 141), completed a third party report in support of plaintiff's application. AR 98-104. Mr. Nguyen stated that he has known plaintiff for three years, and spends time with him daily. He stated that plaintiff needs to be reminded to bathe and groom himself, and to take his medication. AR 99-100. He stated that plaintiff does not prepare his own meals, but eats with Mr. Nguyen's family. AR 100. Mr. Nguyen stated that plaintiff does no regular household chores, that he hates the noise of the vacuum and lawnmower, but will daily do "some clean[ing], such as: use the broom to clean the table, chairs, sofa." AR 98, 100, 102. Mr. Nguyen stated that plaintiff rarely goes out, does not go out alone because he could lose his way home, and rarely drives because be might get in an accident. AT 101. Mr. Nguyen stated that plaintiff does not have any bank accounts or pay any bills because he could make a mistake. *Id.* Mr. Nguyen stated that plaintiff watches TV with Mr. Nguyen's child a few times week, but his children need to lower their voices. AT 102. Mr. Nguyen opined that plaintiff can pay attention for only 10 to 15 minutes. AR 103.

VI. DISCUSSION

    A. LANGUAGE AND LITERACY LIMITATIONS

Plaintiff contends that the Commissioner erred in concluding that plaintiff can perform the mental demands of unskilled work because he failed adequately to consider the limitations

associated with plaintiff's inability to communicate in English, citing the ALJ's findings that plaintiff "does not speak English," is "unable to communicate in English," and is "illiterate in English," AR 14, 19, 21, 22. Plaintiff relies on the express finding of Dr. Wakefield that plaintiff "appears to be *able* to interact with co-workers, supervisors, and the public in *Vietnamese*," AR 164 (emphasis added), and infers that Dr. Wakefield therefore implicitly concluded that plaintiff is *unable* to interact with co-workers, supervisors, and the public in *English*. Plaintiff contends that the ALJ failed to give clear and convincing reasons for rejecting this inferred "finding" of Dr. Wakefield.

This court does not discern the same inference in Dr. Wakefield's report. Rather, in concluding that plaintiff was malingering, Dr. Wakefield found support in plaintiff's apparent competence and ease in his native language. In making his formal finding that plaintiff is "unable to communicate in English," the ALJ relied upon 20 C.F.R. § 416.964, which provides that the Commissioner will "consider a person's ability to communicate in English when we evaluate what work, if any, he or she can do." Accordingly, these limitations were considered by the ALJ when he relied upon the Medical-Vocational guidelines as a framework in finding plaintiff not disabled; these guidelines expressly incorporate consideration of a claimant's illiteracy or inability to communicate in English. *See, e.g.*, 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(i) ("While illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance.")

The court therefore finds no substance to plaintiff's contention that the Commissioner failed adequately to consider the limitations associated with plaintiff's illiteracy and inability to communicate in English.

////

////

## B. REVIEW OF THE MEDICAL EVIDENCE

Plaintiff contends that the ALJ improperly weighed the medical evidence in assessing plaintiff's mental residual functional capacity, particularly by relying on the opinion of examining consultative psychologist James Wakefield, Ph.D., and rejecting the opinion of examining consultative psychiatrist Les P. Kalman, M.D. Pl.'s Mem., at pp. 7-13. Plaintiff also contends, in his reply brief, that the ALJ failed to assess the functional restrictions associated with his finding that plaintiff has moderate difficulties in maintaining concentration, persistence or pace. Pl.'s Reply, at p. 3. The latter contention is meritorious on its face but, for the following reasons, does not require remand of this case for further proceedings.

### 1. Limitations in Concentration, Persistence or Pace

In concluding that plaintiff's post-traumatic stress disorder is a severe impairment, the administrative law judge adhered to the analysis set forth in 20 C.F.R. § 416.920a. This regulation requires that the ALJ rate the degree of functional limitation resulting from a medically determinable mental impairment in accordance with the following four functional areas (the "B criteria"): Activities of daily living; Social functioning; Concentration, persistence, or pace; and Episodes of decompensation. A five-point scale is used to rate the degree of limitation in the first three functional areas ("None, mild, moderate, marked, and extreme"). A four-point scale is used to rate the degree of limitation in the fourth functional area ("None, one or two, three, four or more). A rating of "none" or "mild" in the first three functional areas, and "none" in the fourth area, will generally direct a conclusion that the mental impairment is not severe, unless other evidence indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 416.920a (d)(1). In contrast, "[t]he last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." *Id.* at § 416.920a(c)(4).

The ALJ found that plaintiff's medically determinable mental impairment of post-traumatic stress disorder causes him "to experience no restriction in [his] activities of daily

living; mild difficulties maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace." AR 19. The ALJ found that plaintiff "has not had an episode of decompensation of extended duration." *Id.* Accordingly, while not mandatory under the regulations, the ALJ concluded that plaintiff's post-traumatic stress disorder is a severe mental impairment, apparently based on his findings that plaintiff has moderate difficulties in maintaining concentration, persistence or pace, and mild difficulties in maintaining social functioning.

However, the ALJ then concluded that plaintiff "retains the following residual functional capacity: does not speak English, occasional public contact," AR 19, and evaluated these limitations in the remainder of his analysis, AR 19-21, but did not consider any limitations associated with his finding that plaintiff has moderate difficulties in maintaining concentration, persistence or pace.

Nonetheless, the ALJ's analysis of the medical evidence supports a finding that plaintiff has no more than mild limitations in his ability to maintain concentration and pace. The evidence upon which the ALJ placed greatest weight – the report of Dr. Wakefield, and the assessment of Dr. Walk – found, respectively, that plaintiff's "concentration, persistence, and pace are presented as deficient, although stronger abilities in this area are suspected" based on plaintiff's apparent malingering (Dr. Wakefield, AR 164), and that plaintiff's capacity to maintain "sustained concentration and persistence," as measured by eight specific abilities, was uniformly "not significantly limited" (Dr. Walk, AR 177-178). The ALJ placed "great weight" on the findings of Dr. Wakefield, and "substantial weight" on the findings of Dr. Walk. AR 18. The only medical report to find significant limitations in plaintiff's capacity to maintain "sustained concentration and persistence," was that of Dr. Kalman, AR 215, whose report the ALJ gave only "reduced weight," AR 19. Hence, pursuant to the medical evidence upon which the ALJ relied, there is no support for the ALJ's finding that plaintiff has moderate difficulties in maintaining concentration, persistence or pace, AR 19; the finding is inconsistent with the body

14

of the ALJ's decision. Moreover, since the ALJ did not again refer to this finding, including in his discussion of plaintiff's limitations in social functioning and communicating in English (AR 19-21), it appears clear to this court that the finding was drafted or typed in error; there is no support of the finding in the evidence relied upon by the ALJ.

Moreover, as found by the ALJ, this case presents significant evidence of malingering, or symptom exaggeration. Absent such evidence, the internal inconsistency of the ALJ's decision might require remand for reconciliation of the ALJ's findings and further proceedings if necessary. However, such reconciliation is not required here, where the Commissioner's rejection of plaintiff's allegation of disabling mental impairment is well supported by the record.

### 2. Rejection of Dr. Kalman's Report

Plaintiff contends that the ALJ improperly discredited the opinion of Dr. Kalman, and improperly relied on the opinion of Dr. Wakefield.

The Commissioner is directed to weigh medical opinions based in part on their source, specifically, whether proffered by treating, examining, or non-examining professionals. *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional. *Id.; Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir.1996); *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987). The least weight is given to the opinion of a non-examining professional. *Pitzer v. Sullivan,* 908 F.2d 502, 506, n. 4 and related text (9th Cir.1990); *see generally,* 20 C.F.R. § 416.927.

The Commissioner must also consider whether a medical opinion is supported by clinical findings and is contradicted by other medical evidence of record. The Commissioner may reject the uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 831. A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence. *Id.* at 830. This test is met if the

15

Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states his interpretation of the evidence, and makes a finding. *Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir. 1989). The Commissioner need not give any weight to a conclusory opinion supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir.1999); *see also Magallanes,* 881 F.2d at 751.

In the present case, the ALJ discredited the findings of Dr. Kalman because "they are inconsistent and contrast sharply with the other evidence of record, rendering them less persuasive." AR 19. In contrast, the ALJ gave "great weight" to the findings of Dr. Wakefield because "based on an in-person exam with testing[,] and specific facts are cited upon which the conclusions are based, and they are consistent with the record as a whole." AR 18. Although brief, these reasons are "specific and legitimate." They are, moreover, well supported by an independent review of Dr. Kalman's report, particularly in comparison to the report of Dr. Wakefield.

The report of Dr. Kalman, "The Mobile Doc of the Bay," AR 203, is notable because it is based on no standardized testing. "Source of information" was described as "[t]he patient himself who is a poor historian and accompanying records." *Id.* The otherwise unidentified medical records are referenced only as follows: "[Plaintiff] is seen in Mental Health every two months, where he has been going for a few years." AR 204. Unlike the examination of Dr. Wakefield, which included administration of the TONI-3 and Bender Gestalt, AR 162, Dr. Kalman merely interviewed plaintiff, a concededly "poor historian."

Additionally, there are inherent inconsistencies in Dr. Kalman's report, e.g., "[Plaintiff] was driven to the office by a friend," "currently lives with a friend," and "he has no friends," AR 203, 204, 205; and "[Plaintiff] is unable to pay his own bills," and "The patient is competent to manage his own funds," AR 205.

Further, while more weight is generally accorded to the medical examiner having greater relevant expertise, *see, e.g.,* 20 C.F.R. § 416.927(d)(5) (more weight generally accorded to the

16

opinion of a specialist about medical issues related to his or her area of specialty), this rule loses application when the distinctions become blurred, here as to the general assumption that a psychiatrist has greater expertise than a psychologist. Dr. Kalman's designation is "Board Eligible" rather than "Board Certified" Psychiatry, AR 205, while Dr. Wakefield holds three professional licenses, viz., psychologist, educational psychologist and school psychologist, AR 161.

This court concludes that the ALJ's reliance on the report of Dr. Wakefield, and rejection of Dr. Kalman's report, was proper and well supported. In addition to the foregoing reasons, the ALJ may resolve conflicts in the evidence by relying on the assessment of an examining source whose opinion is supported by independent clinical findings. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir.1995).

Dr. Wakefield's findings include that plaintiff appeared to be exaggerating his symptoms. As the ALJ recounted (AR 17, 18):

> The record [] includes statements strongly suggesting that the claimant may be misrepresenting the degree of limitation present. . . . The ALJ further found: "The claimant's answers to part of the test [TONI-3] showed a pattern of responding to more difficult items correctly and missing the easier ones, strongly suggested malingering []. The claimant was given Axis I diagnoses of malingering and post-traumatic stress disorder []. His Global Assessment of Functioning (GAF) was rated as 'unknown due to malingering' []. . . . The claimant's ability to perform more complex procedures could not be assessed due to malingering . . .

In addition to relying on these findings, the ALJ gave additional reasons for discrediting plaintiff's subjective complaints. Clarifying that he did not find plaintiff "at all times symptom free," the ALJ nonetheless concluded that "the evidence does not support the degree of limitation [he] alleges." AR. 16. The ALJ found plaintiff's testimony that "he does not do anything during the day" inconsistent with the "relatively weak medical evidence" demonstrating that plaintiff "has not generally received the type of medical treatment one would expect for a totally disabled individual," and that his "alleged loss of functions is not supported by objective medical findings." AR 16-17. The ALJ also relied in part on plaintiff's "generally unpersuasive

appearance, presentation and demeanor while testifying at the hearing." AR 17.

The ALJ further noted "discrepancies between the claimant's assertions and information contained in the documentary reports and the reports of the treating and examining practitioners." AR 16. While not articulated by the ALJ, these discrepancies include the following, apparent upon review of the entire record: (1) that plaintiff filed his disability application the same month he first reported symptoms of mental impairment to his medical providers, AR 168; (2) that plaintiff has described his employment only as a butcher, which ended in 1996, *see supra*, but he reported last working in 2001, AR 78, 135; and (3) that plaintiff told both Dr. Wakefield and San Joaquin County Mental Health Services that he has a manicure license, and told Dr. Wakefield that he attended adult school, but the record contains no reference to such specialized training or schooling, despite plaintiff's completion of forms requesting such information, e.g., AR 139.

Significantly, plaintiff does not challenge the ALJ's negative credibility assessment.

C.  THIRD PARTY EVIDENCE

Plaintiff contends that the ALJ failed to give sufficiently specific reasons for discrediting the statement of plaintiff's friend, Hien Nguyen. The ALJ found, "I do not give significant credibility to the third party evidence because that evidence is not based on medical expertise and likely reflects the claimant's symptomatological [sic] exaggerations." AR 17.

The Commissioner is required to consider observations by non-medical sources regarding how an impairment may affect a claimant's ability to work. 20 C.F.R. § 20 C.F.R. § 416.913 (d)(4) (evidence from non-medical sources may be relied upon to show severity and impact of impairment). Such testimony is competent evidence and "cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). If the ALJ discredits the testimony of a lay witnesses, he must give specific reasons that are germane to that witness. *Dodrill v. Shalala*, 12 F.3d 915, 918-919 (9th Cir. 1993); *Bruce v. Astrue*, ___F.3d ___, 2009 WL 539945, 2 (9th Cir. 2009).

The ALJ incorrectly rejected Mr. Nguyen's opinion because it was not based on medical expertise. *See Bruce, supra*, at 2 ("Nor under our law could the ALJ discredit [] lay testimony as not supported by medical evidence in the record")(citing *Smolen*, 80 F.3d at 1289).

However, on the present record, the ALJ properly opined that Mr. Nguyen's statement was likely based on plaintiff's exaggeration of symptoms. *See, e.g.*, *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001) (substantial evidence supported ALJ's discrediting of family members' testimony based on findings in other parts of decision demonstrating contradictions in the testimony). The ALJ's reliance on Dr. Wakefield's findings of symptom exaggeration, and the decision of plaintiff not to challenge the ALJ's credibility findings, support the ALJ's rejection of Mr. Nguyen's statement.

## VII. CONCLUSION

In conclusion, this court finds that the Commissioner's decision is based on proper legal standards and supported by substantial evidence. Plaintiff has set forth no basis for overturning the Commissioner's finding that plaintiff can perform the mental demands of unskilled work.

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment or remand, Dckt. No. 13, is denied;

2. The Commissioner's cross-motion for summary judgment, Dckt. No. 14, is granted; and,

3. The Clerk is directed to enter judgment for the Commissioner.

SO ORDERED.

DATED: March 19, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE